2023 SUPER PA 59

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MELISSA LIN KEISTER | : | |
| | : | |
| Appellant | : | No. 282 MDA 2022 |

Appeal from the Judgment of Sentence Entered December 21, 2021
In the Court of Common Pleas of Union County Criminal Division at
No(s):  CP-60-CR-0000306-2019

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and NICHOLS, J.

OPINION BY NICHOLS, J.:                    **FILED: APRIL 4, 2023**

Appellant Melissa Lin Keister appeals from the judgment of sentence imposed after a jury convicted her of endangering the welfare of a child (EWOC).  Appellant challenges the sufficiency of the evidence supporting her conviction.  Following our review, we affirm.

The underlying facts of this matter are well known to the parties.  Briefly, Kaley Zepp and her daughter, J.L.[1] (Child), moved in with Appellant in 2013. On December 5, 2013, Zepp appointed Appellant as Child's guardian and Child remained in Appellant's care until April of 2018.  During that time, Appellant often punished Child by withholding food.  Appellant also made Child sleep on

---

[1] Child was previously known as A.Z.  Following Child's removal from Appellant's care, Divenia Lockett gained custody of Child through the foster care system on December 31, 2018.  Lockett adopted Child on October 16, 2019.  Upon her adoption in 2019, Child changed her name to J.L.

a three-by-four-foot area on the floor of Child's bedroom, often without a mattress, pajamas, or a blanket. Child was diagnosed with Post-Traumatic Stress Disorder (PTSD), Reactive Attachment Disorder (RAD), and Oppositional Defiant Disorder. While in Appellant's home, Child suffered from chronic malnourishment and sleep deprivation. Children and Youth Services (CYS) removed Child from Appellant's home in April 2018 after responding to a report of child abuse. At that time, CYS observed that Child was underweight, and that her spine and ribs were protruding. In the six months after Child was removed from Appellant's home, Child gained twenty-eight pounds, grew two inches taller, and her RAD symptoms disappeared.

On September 25, 2019, the Commonwealth charged Appellant with EWOC and recklessly endangering another person (REAP).[2] On September 30, 2021, a jury found Appellant guilty of EWOC,[3] which was graded as a felony of the third degree. On December 21, 2021, the Honorable Michael T. Hudock sentenced Appellant to a period of three years' probation. Appellant filed a timely post-sentence motion challenging the sufficiency of the evidence, which the trial court denied.[4]

_____

[2] 18 Pa.C.S. §§ 4304(a)(1) and 2705, respectively.

[3] The Commonwealth *nolle prossed* the REAP charge at trial.

[4] On February 3, 2022, the Honorable Michael H. Sholley denied Appellant's motion on the grounds that former President Judge Hudock, who presided over Appellant's trial, had retired, and that President Judge Sholley was unable to address the issues raised in Appellant's motion.

Appellant filed a timely notice of appeal and Pa.R.A.P. 1925(b) statement. President Judge Sholley issued a Rule 1925(a) opinion indicating that former President Judge Hudock had retired and was unable to write an opinion addressing the issues Appellant raised on appeal. *See* Trial Ct. Op., 3/18/22, at 1-3.[5]

On appeal, Appellant raises the following issue for our review:

Whether the evidence is insufficient to sustain the jury's guilty verdict on the charge of [EWOC.]

Appellant's Brief at 4.

In support of her sufficiency claim, Appellant argues that she did not knowingly place Child at risk, and that she made a mistake in failing to provide proper care.[6] *Id.* at 12-13. Appellant asserts that healthcare workers were present to monitor Child's well-being, safety, and eating habits, and that those healthcare workers allowed Appellant's allegedly dangerous conduct to continue. *Id.* at 13. Appellant also claims that a conviction for EWOC would hold Appellant to a much higher standard than the caregivers and professionals who oversaw her actions. *Id.* Therefore, Appellant concludes

---

[5] President Judge Sholley concluded that because he did not preside over Appellant's trial, he was unable to provide any additional information regarding Appellant's claims. *See* Trial Ct. Op. at 3.

[6] Appellant does not dispute that she was Child's guardian and that she had a duty of care. Appellant only contests the sufficiency of the evidence to establish the *mens rea* for EWOC. *See* Appellant's Brief at 11-13.

that the evidence was insufficient to establish that she knowingly endangered the welfare of Child. *Id.* at 12-13.

When reviewing a sufficiency claim, our standard of review is as follows:

Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the factfinder.

*Commonwealth v. Palmer*, 192 A.3d 85, 89 (Pa. Super. 2018) (citation omitted and formatting altered).

Section 4304 defines EWOC, in relevant part, as follows: "A parent, guardian, or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he [or she] knowingly endangers the welfare of the child by violating a duty of care, protection, or support." 18 Pa.C.S. § 4304(a)(1). Further, "[i]f the actor engaged in a course of conduct of endangering the welfare of a child, the offense constitutes a felony of the third degree." 18 Pa.C.S. § 4304(b)(ii); *see also Commonwealth v. Spanier*, 192 A.3d 141, 146 (Pa. Super. 2018) (holding that the Commonwealth must prove that a defendant

- 4 -

engaged in a course of conduct in order to sustain a conviction for EWOC that is graded as a felony of the third degree).

To sustain a conviction for EWOC, the Commonwealth must prove that a defendant knowingly violated a duty of care to the minor victim. ***Commonwealth v. Sebolka***, 205 A.3d 329, 337 (Pa. Super. 2019). More precisely, the Commonwealth must prove that: 1) the accused is aware of his or her duty to protect the child; 2) the accused is aware that the child is in circumstances that could threaten the child's physical or psychological welfare; and 3) the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare. ***Id.***

This Court has held that there is sufficient evidence to demonstrate a defendant's intent when a child suffers from health problems caused by malnutrition and sought out other sources of food because the parent was severely underfeeding them, notwithstanding the parent's claims that she had made a legitimate mistake as to the necessary caloric intake requirements of the children. ***Id.*** at 338.; ***see also Commonwealth v. Kerstetter***, 1367 MDA 2019, 2020 WL 2025979, at *2-4 (Pa. Super. filed Apr. 27, 2020) (unpublished mem.)[7] (concluding that there was sufficient evidence to establish intent under Section 4304 where the defendant, who was a school

_____

[7] We may cite to non-precedential decisions of this Court filed after May 1, 2019, for their persuasive value. ***See*** Pa.R.A.P. 126(b).

bus driver, abandoned two children on the side of an unfamiliar road for their unruly behavior without notifying anyone as to their location).

Here, at trial, the Commonwealth presented three witnesses who were acquainted with Appellant and Child prior to 2018. Kara Plank testified that that she saw Appellant and Child "a minimum of two times a month" in meetings for a childcare group throughout 2015 and 2016. N.T. Trial, 9/28/21, at 38. During that time, Ms. Plank stated that she never saw Child eating, even though other mothers provided food to their children during their meetings. *Id.* at 37-41. Ms. Plank testified that Appellant had stated that Child "wasn't allowed to eat," because Child was "being disciplined," and that Child "wasn't able to be trusted with more than the bare necessities." *Id.* at 41-42. Janelle Watkins similarly testified that she observed Appellant with Child several times a month from 2015 to 2018 and that she "never saw [Child] eat food" even though Appellant would feed her other children. *Id.* at 53-55. Additionally, Alecia Baker recalled an instance where Appellant denied Child a snack because Child had not eaten her breakfast. N.T. Trial, 9/29/21, at 192-200. Ms. Baker stated that Child refused to eat when Appellant was present, but that Child would eat when Appellant was not in the room. *Id.* at 202.

The Commonwealth also presented testimony from three home health workers employed with Interim Health Care. Melissa Moon testified that she was on duty at Appellant's home from 10 p.m. to 6 p.m. six nights per week from February through April of 2018. N.T. Trial, 9/28/21, at 63, 66. Ms. Moon

stated that on February 12, 2018, she discovered that Child was sleeping on an area taped to the hardwood floor of her bedroom without a mattress or blankets. *Id.* at 67-69. Ms. Moon stated that initially, Child slept in zip-up pajamas where "she pulled herself inside kind of like a turtle" in order to keep warm. *Id.* at 68. However, Ms. Moon stated that Child's pajamas were ultimately taken away because, after Ms. Moon's shift ended at 6 a.m., Appellant claimed that Child had been "choking herself with the pajamas." *Id.* Ms. Moon stated that Child continued to sleep on the floor without a blanket or pajamas until April 2, 2018. *Id.* at 69. Ms. Moon also testified that Appellant forbade Ms. Moon from giving Child water or taking her to the bathroom. *Id.* at 71.

Sharon Reidle testified that although she did not read the case notes "right away," she ultimately learned that Child had been sleeping without blankets, pillows, or pajamas. N.T. Trial, 9/29/21, at 124. Ms. Reidle stated that the items were reportedly taken from Child "because she was hurting herself or trying to hurt herself with those things[.]" *Id.* Ms. Reidle testified that Appellant returned the items to Child on April 2, 2018, after Ms. Reidle expressed concerns about Child's inability to gain weight. *Id.* at 123, 124. In response to Ms. Reidle's concerns, Appellant said "maybe we should start over and give [] those things back" to Child. *Id.* at 123, 124.

Finally, Chelsea Neff testified that she observed Child from February 1, 2018 to April 4, 2018, and that Appellant made Child sleep on a three-by-four area on the floor of the bedroom without a mattress. N.T. Trial, 9/28/21, at

89-90. Ms. Neff stated that Child had difficulty staying awake and paying attention due to her lack of sleep. *Id.* at 89, 91. Ms. Neff also testified that Appellant implemented a rule in which Child would not receive a meal if Child were caught stealing food. *Id.* at 93. However, Ms. Neff stated that Appellant "would find things in [Child's] mouth and consider that stealing food," and would refuse to feed Child on a near-daily basis. *Id.*

The Commonwealth also presented testimony from CYS supervisor Brenda Erdley, who accompanied another case worker to investigate allegations of child abuse against Appellant in April of 2018. At that time, Ms. Erdley observed a mattress on the floor of Child's bedroom, but "no blankets, sheets, [or] pillows," and "a square in the middle of the room taped to the floor." *Id.* at 118. Ms. Erdley stated that she took photographs of Child which depicted her condition at that time. *Id.* at 120. The photos, which were admitted as evidence and shown to the jury, showed that Child's spine and ribs were protruding, as well as Child's thin legs and buttocks. *See id.* at 165; Commonwealth's Ex. 3a, 3b, 3c. CYS subsequently removed Child from Appellant's home at the end of April in 2018. *Id.* at 135.

Dr. William Krieger, a licensed psychologist, first evaluated Child on September 30, 2016, and conducted additional follow-up evaluations over the years. N.T. Trial, 9/29/21, at 5-7. Dr. Krieger diagnosed Child with PTSD, RAD, and Oppositional Defiant Disorder. *Id.* at 13. Dr. Krieger testified that Child "may have refused food because certain foods could be trigger foods" or "because of the way they were prepared or fearing for their safety." *Id.* at

25. However, Dr. Krieger stated that Child's issue was "not refusing food, but hoarding food" which is a behavior that is "symptomatic of past very severe trauma and past food insecurity" and is "particularly pronounced with children who have been deprived of food." *Id.* at 24-25. Dr. Krieger also noted that Child feared leaving her room at night and would "use her bedroom as toilet facilities." *Id.* at 26. He also stated that Child used "feces to cover food and other personal belongings, [which is] not an unusual reaction to stress" and is "very commonly seen in prisoners of war or people who have been deprived of all control of anything." *Id.* Dr. Krieger opined that, if Child was in an abusive environment, that could have precipitated or exacerbated Child's PTSD. *Id.* at 31-32. Additionally, Dr. Krieger confirmed that if Child were being denied food, that would explain why Child had been hoarding food. *Id.* at 33.

Julie Savage, a licensed social worker, testified that she started working with Child in Appellant's home in April of 2015. *Id.* at 51. Ms. Savage was present when Dr. Krieger diagnosed Child with RAD. *Id.* at 54. She noted that Child had inappropriate interactions with others, which is consistent with the symptoms of RAD. *Id.* at 55-56. Ms. Savage testified that Child would occasionally refuse to come to the table for dinner and that Appellant was concerned about Child's weight. *Id.* at 59-61.

The Commonwealth also presented testimony from Dr. Pat Bruno, M.D., an expert in general pediatrics and child abuse pediatrics. N.T. Trial, 9/28/21, at 127-29. Dr. Bruno testified that he examined Child upon her removal from

Appellant's home and was concerned about her weight. *Id.* at 130-31. Dr. Bruno examined Child again six months later, and he observed that Child had gained twenty-eight pounds and had grown two inches taller. *Id.* at 135-36. Dr. Bruno stated that he did not initially recognize Child at the follow-up examination and stated that she "was a changed child in many ways." *Id.* at 136.

Rebecca Lindauer, a physician assistant who worked with Child, testified as an expert in child psychiatry. Ms. Lindauer saw Child on a monthly basis from the end of 2016 to the end of 2018. *Id.* at 149-50. Ms. Lindauer noted that there "was no report of refusals to eat," after Child left Appellant's home. *Id.* at 153. Ms. Lindauer also claimed that Child's symptoms of RAD, including irritability, agitation, fearfulness, and difficulty expressing positive emotions, were "no longer present," after Child left Appellant's home. *Id.* at 154-55.

Following our review of the record, we conclude that the evidence was sufficient to sustain Appellant's conviction for EWOC. *See Palmer*, 192 A.3d at 89. The record contains testimony from multiple witnesses establishing that Appellant engaged in a course of conduct that included withholding food from Child as punishment and forcing Child to sleep on a bare hardwood floor without a blanket or pajamas. As a result of these conditions, Child exhibited stress responses such as food hoarding and covering her belongings and food in feces. She also suffered from malnutrition, sleep deprivation, and behavioral problems consistent with her RAD diagnosis. By the time Child was removed from Appellant's home in 2018, Child was so underweight that her

spine and ribs were visible. ***See*** N.T. Trial, 9/28/21, at 165; Commonwealth's Ex. 3a, 3b, 3c. Additionally, just six months after Child was removed from Appellant's home, she had grown two inches taller and gained twenty-eight pounds. ***See id.*** at 127-38. The negative behaviors associated with Child's RAD diagnosis also dissipated after Child's removal. ***See id.*** at 146-58.

On this record, we conclude that there was sufficient evidence to establish that Appellant engaged in a course of conduct in which she knowingly violated her duty of care to Child, was aware of circumstances that threatened Child's physical and psychological welfare and failed to protect Child's welfare. ***See Spanier***, 192 A.3d at 144; ***Sebolka***, 205 A.3d at 337-38; ***see also*** 18 Pa.C.S. § 4304(a)(1), (b)(ii). For these reasons, Appellant is not entitled to relief. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/4/2023