J-S48037-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| OMAR LEWIS | : | |
| | : | |
| Appellant | : | No. 2947 EDA 2023 |

Appeal from the Judgment of Sentence Entered October 26, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0007140-2021

BEFORE: STABILE, J., NICHOLS, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED JANUARY 28, 2025**

Appellant, Omar Lewis, appeals from the aggregate judgment of sentence of life imprisonment, without the possibility of parole, imposed after a jury convicted him of first-degree murder and endangering the welfare of children (EWOC). On appeal, Appellant challenges the weight and sufficiency of the evidence to sustain his convictions, as well as the trial court's admission of prior-bad-acts evidence. After careful review, we affirm.

The trial court provided a detailed summary of the facts and procedural history of Appellant's case, which we adopt herein. *See* Trial Court Opinion (TCO), 5/3/24, at 1-14. We only briefly note that Appellant was convicted of the above-stated crimes based on evidence that in 2015, he strangled to death his paramour, Andrea Roberts. Appellant then fled the couple's home, leaving their one-year-old daughter alone in the house with Ms. Roberts' elderly mother, who was not fit to care for the child due to her suffering from

advanced stages of Alzheimer's disease. Several days passed before the child and Ms. Roberts' mother were found. Meanwhile, Appellant fled back to his home country of Jamaica. It was not until 2020 that he was apprehended and extradited back to Pennsylvania.

Appellant proceeded to a jury trial in October of 2023, and was convicted of first-degree murder and EWOC. That same day, the court sentenced him to an aggregate term of life imprisonment, without the possibility of parole. Appellant filed a timely post-sentence motion that was denied. He then filed a timely notice of appeal, and he and the trial court complied with Pa.R.A.P. 1925. Herein, Appellant states the following issues for our review:

> 1. Was the verdict against the weight of the evidence?
>
> 2. Was the evidence sufficient to establish [Appellant's] guilt beyond a reasonable doubt for murder of the first-degree and EWOC?
>
> 3. Did the [c]ourt err by admitting into evidence police testimony of two domestic violence reports, as no arrests were made, and both the decedent and [Appellant] were complainants[?]

Appellant's Brief at 6.

In assessing Appellant's issues, we have reviewed the certified record, the briefs of the parties, and the applicable law. Additionally, we have examined the well-reasoned opinion of the Honorable Charles A. Ehrlich of the Court of Common Pleas of Philadelphia County. We conclude that Judge Ehrlich's comprehensive opinion accurately disposes of the issues presented

- 2 -

by Appellant.[1]  Accordingly, we adopt Judge Ehrlich's opinion as our own and affirm Appellant's judgment of sentence for the reasons set forth therein.

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/28/2025

_____

[1]  This is especially true because Appellant's arguments are wholly undeveloped.  For instance, aside from briefly setting forth the applicable legal principles, Appellant provides only two sentences of argument regarding how the jury's verdict convicting him of first-degree murder was against the weight of the evidence, and only two sentences explaining why the evidence was insufficient to support that conviction.  *See* Appellant's Brief at 9, 11.  Additionally, Appellant offers only five sentences in support of his weight-of-the-evidence claim regarding his EWOC offense, *id.* at 10, and he provides no argument pertaining to EWOC in his challenge to the sufficiency of the evidence.  *See id.* at 10, 11.  In regard to Appellant's argument that the trial court erred by permitting the Commonwealth to admit prior-bad-acts evidence, Appellant provides only five sentences, with no citation to any legal authority at all.  *Id.* at 12.  Overall, Appellant's entire "Argument" section for all three of his issues covers just four pages of his brief.  *See id.* at 9-12.  We also note with disapproval that Appellant did not set forth any discussion of the facts in his "Statement of the Case" section of his brief.  *Id.* at 7.  In sum, Appellant's undeveloped argument fails to demonstrate that his claims have any merit, especially in light of the trial court's thorough and well-reasoned opinion.

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CRIMINAL SECTION


Commonwealth of Pennsylvania      :      CP-51-CR-0007140-2021

**FILED**    :

v.      **MAY 0 3 2024**    :

     **Appeals/Post Trial**

Omar Lewis    **Office of Judicial Records**    SUPERIOR COURT NO:
     :      2947 EDA 2023


## OPINION

Ehrlich, J.

Omar Lewis, hereinafter referred to as "Appellant," was found guilty by a jury on October 26, 2023, of Murder of the First Degree and Endangering Welfare of Children. On the same date, this Court sentenced Appellant to a mandatory term of life imprisonment without the possibility of parole and a concurrent term of one (1) to two (2) years of confinement. Appellant timely appealed his judgment of sentence, challenging the weight and sufficiency of the evidence for both of his convictions and the admission of police testimony regarding two (2) domestic violence reports involving Appellant. Appellant's claims are without merit and no relief is due.

### Statement of Facts

In the evening hours of April 5, 2015, Devon Gayle, a Jamaican immigrant who had lived in Philadelphia since 2000, received a voicemail from an unknown Jamaican number. Mr. Gayle subsequently listened to the voicemail the caller left, wherein the caller, who Mr. Gayle recognized as Appellant, admitted to killing Andrea Roberts and leaving her body in the home they shared at 5402 Willows Avenue. Mr. Gayle subsequently went to the police department, reported what he heard in the voicemail, and accompanied police to Ms. Roberts' home. Upon

1

arrival and entry into the home, police found Ms. Roberts dead in the condition that Appellant had described in the voicemail he left for Mr. Gayle. In another room of the home, police also found Nora Roberts, the elderly mother of Ms. Roberts, and D.L., the one (1)-year-old daughter of Ms. Roberts and Appellant.

Police eventually discovered that Appellant had fled to Jamaica and began a lengthy extradition process. In October 2020, Appellant was successfully extradited into the custody of the Philadelphia Police Department. Appellant was subsequently arrested and charged with Murder[1] and Endangering Welfare of Children.[2] At trial, the Commonwealth presented ten (10) witnesses as part of its case-in-chief against Appellant: Philadelphia Police Officers Robert Flade and Mark Brockington, Philadelphia Police Sergeant Michael Davis, Philadelphia Police Detectives Devin Chadderton and John Bartol, Dr. Khalil Wardak, forensic scientist Jean Hess, Devon Gayle, Nicholas Tejada, and Sheena Douglas. The trial evidence and testimony given at Appellant's trial are summarized below.

Devon Gayle testified that he met Andrea Roberts in 2007 while applying for a driver's license at PennDOT. Mr. Gayle stated that he and Ms. Roberts – who were both from the same community in Jamaica and both spoke Jamaican Patois – began a romantic relationship in 2007 which ended sometime prior to 2008. Despite this failed romantic relationship, Mr. Gayle testified that he and Ms. Roberts remained "good friends" and spoke to each other on the phone or in person every day. Mr. Gayle testified that he first met Appellant, who he knew as "Danny," in 2014. Mr. Gayle explained that Ms. Roberts had met Appellant in Jamaica, later married him, and then brought him with her to Philadelphia. N.T. 10/24/2023, at 6-12.

---

[1] 18 Pa. C.S.A. § 2502.
[2] 18 Pa. C.S.A. § 4304(a)(1).

2

Mr. Gayle testified that he last spoke on the phone with Ms. Roberts on the morning of Friday, April 3, 2015. Mr. Gayle attempted to call Ms. Roberts back later that same day, on Saturday, April 4, 2015, and on Sunday, April 5, 2015, but Ms. Roberts did not answer any of these calls. On the evening of Sunday, April 5, Mr. Gayle received a phone call and voicemail from an unknown number which Mr. Gayle noted had a Jamaican area code. Mr. Gayle later listened to the voicemail and testified that he recognized Appellant's voice on it speaking Jamaican Patois. Mr. Gayle explained that although he had not saved Appellant's number in his phone, he was familiar with Appellant's voice because of several occasions where Appellant had spoken to Mr. Gayle over the phone and requested that he acquire marijuana for Appellant in exchange for money. Mr. Gayle admitted that he had previously omitted these details in his initial statement to the police and at Appellant's preliminary hearing. *Id.* at 12-16, 24-26, 57-58.

After Mr. Gayle listened to the voicemail, he eventually decided to go to the police station to report the voicemail. Once Mr. Gayle arrived at the police station, he translated the voicemail for the officers present. Mr. Gayle recounted the translation he provided for the police, testifying that Appellant began the message by declaring that Ms. Roberts was dead and stating that he had left Ms. Roberts' mother and daughter unharmed. Appellant then claimed in the voicemail that Ms. Roberts had "disrespected" him and threatened to tell the police that Appellant was going to shoot her. Claiming that he still cared for Ms. Roberts, Appellant explained that he had left flowers around Ms. Roberts' body after the murder. Finally, Appellant requested that Mr. Gayle turn the voicemail over to the police and "tell President Obama to adopt his daughter" that he shared with Ms. Roberts. *Id.* at 16-23.

Philadelphia Police Sergeant Michael Davis testified that he was reporting to police headquarters on the evening of April 5, 2015, when he overheard a conversation between another

police officer and Mr. Gayle. After Mr. Gayle relayed the information contained in Appellant's voicemail, Sergeant Davis, four (4) other officers, and Mr. Gayle all went to 5402 Willows Avenue in Philadelphia to investigate Gayle's concerns. Upon arrival, Sergeant Davis knocked on the front door of the home, which was locked, while the other officers knocked on the door of the rear basement apartment next to Ms. Roberts' home. Philadelphia Police Officer Mark Brockington testified that the occupants of the basement apartment answered their door and informed officers that there was a baby in the upstairs apartment, but that they were unable to offer the officers access to Ms. Roberts' residence. *Id.* at 154-55; N.T. 10/25/2023, at 7.

Sergeant Davis testified that after a couple minutes of knocking on the front door of the home with no response, he called for fire board – a division within the Philadelphia Fire Department – to facilitate entry into the home. Fire board soon arrived with a ladder engine which Officer Brockington used to enter the front bedroom of Ms. Roberts' house through a second-floor window. Officer Brockington then entered the middle bedroom of the home, where he found seventy-four-year-old Nora Barrett, Ms. Roberts' mother, and one-year-old D.L., Ms. Robert's daughter. Officer Brockington spoke with Ms. Barrett but testified that she was elderly and "seemed to have cognitive issues, maybe dementia." Officer Brockington then proceeded to clear the rest of the house, moving to the house's rear bedroom, which was locked from the outside. Officer Brockington knocked and announced his presence but received no response. He then contacted Sergeant Davis, informed him of the individuals he had found in the middle bedroom, and requested permission to take down the door to the rear bedroom. N.T. 10/24/2023, at 156; N.T. 10/25/2023, at 7-10.

Officer Brockington testified that he subsequently kicked down the door and found what appeared to be a dead body covered in a blanket with flowers on and around it. Officer

4

Brockington testified that he spoke again with Ms. Barrett after discovering the body, and that she was able to confirm the decedent's identity as her daughter, Ms. Roberts. After Officer Brockington notified Sergeant Davis about the deceased woman in the home, Sergeant Davis directed fire board to force entry into the home through the front living room door. Once inside, Sergeant Davis also attempted to speak with Ms. Barrett but found she was not "comprehending everything going on around her." Ms. Barrett and D.L. were subsequently taken to the hospital. Sergeant Davis stated that he also personally observed Ms. Roberts' body and noticed blood on her body, swelling to her face, a blanket covering her body, and flowers on her body. Sergeant Davis then called for a medical team, which pronounced Ms. Roberts dead at 12:35 a.m. on April 6, 2015. N.T. 10/24/2023, at 156-158; N.T. 10/25/2023, at 8-12, 18.

Philadelphia Police Officer Robert Flade testified that the Crime Scene Unit was notified at 12:40 a.m. on April 6, 2015. Officer Flade arrived at the scene with Officer Donna Jaconi at 2:50 a.m. that same morning. Once there, Officer Flade performed a standard "walk-through" of the scene and assisted Officer Jaconi in photographing the scene, including all areas of the house along with the rear upstairs bedroom where the body of Ms. Roberts was found. Officer Flade testified that Officer Jaconi took forty-two (42) photographs in total and made particular note of one taken of the deceased where flowers had been placed around her body. Officer Flade testified that no physical evidence or fingerprints were collected from Ms. Roberts' home. N.T. 10/24/2023, at 96-104.

On April 6, 2015, Dr. Gulino of the Philadelphia Medical Examiner's Office conducted an autopsy on Ms. Roberts, which he memorialized in a report. Dr. Khalil Wardak, an expert in forensic pathology, testified that he reviewed everything documented by Dr. Gulino, who was no longer employed by the Medical Examiner's Office. Dr. Wardak testified that Ms. Roberts' body

arrived at the medical examiner's office having undergone a "moderate stage of changes after death." Dr. Wardak stated that the autopsy noted hemorrhages in Ms. Roberts' eye, skull, and neck area. Based on these injuries and the lack of more advanced post-mortem changes to the body, Dr. Wardak estimated that the body had been decomposing for more than one (1) day and likely around three (3) to five (5) days. N.T. 10/24/2023, at 70-76, 84.

Dr. Wardak testified that the cause of Ms. Roberts' death was asphyxia by strangulation. To accomplish this type of asphyxiation, Dr. Wardak explained that the offender would have needed to block Ms. Roberts' airway by applying about twenty (20) pounds of pressure to her throat for approximately fifteen (15) seconds. Dr. Wardak testified that this would have rendered Ms. Roberts unconscious. Had the offender then released the pressure, Ms. Roberts could have regained consciousness within a minute without consequence. However, if the offender instead continued applying pressure to the veins and arteries in the neck, it would have been "very difficult" for Ms. Roberts to regain consciousness. *Id.* at 76-78.

Dr. Wardak identified several injuries on Ms. Roberts' body from photographs taken during her autopsy, including a fracture to her right hyoid bone, a bruise on the left side of her chin, hemorrhages in the muscles of the left side of her neck and under the skin of her scalp on the right side, and ruptured blood vessels at the base of the right side of her neck. Dr. Wardak noted that these injuries were not "bilateral or symmetrical," which indicated to him that they did not result from post-mortem decomposition. Instead, Dr. Wardak concluded that these injuries were consistent with the requisite pressure having been applied to Ms. Roberts' neck area to cause her death by strangulation. *Id.* at 78-81.

Dr. Wardak additionally testified that there were no defensive wounds found on Ms. Roberts' body, suggesting that Ms. Roberts did not struggle against the conditions which caused

her death. The Commonwealth and Appellant's counsel stipulated that the toxicology reports for Ms. Roberts were negative for all substances. Accordingly, Dr. Wardak concluded to "a reasonable degree of scientific certainty" that the manner of Ms. Roberts' death was homicide. *Id.* at 81-82.

Philadelphia Police Detective John Bartol, the lead detective for the investigation into Ms. Roberts' murder, testified that he spoke with Nora Barrett, Ms. Roberts' mother, at the Hospital of the University of Pennsylvania but was unable to conduct a successful interview with her because she was suffering from "advanced stages of Alzheimer's" and could not communicate verbally. Detective Bartol also testified that D.L. was subsequently taken to the Department of Human Services. N.T. 10/25/2023, at 46.

Detective Bartol testified that Detectives Bamberski and Rossiter interviewed Devon Gayle on April 6, 2015. Mr. Gayle gave the detectives permission to download the voicemail from his cellular device. A police officer familiar with Jamaican Patois subsequently created a written English translation of the message contained in the voicemail. The Commonwealth and Appellant's counsel stipulated to the accuracy of the translation, which Detective Bartol read into the record as follows:

> Yo, you know what I'm saying. I want you to listen good. I want you to let the police know I am in Andrea's house . . . key is in the passage to get in the room. I am sorry because of the disrespect. I am sorry man. The baby in the house. Come let the police get her for me tonight. You never see back Andrea's again. . . . Andrea will do better without me. Let me see how she is going to do better without me. She put on a report about me saying I will shoot her in her head. Her mother and the baby, I didn't do anything to her mother and the baby, but I killed her. Make sure you call the police and tell them she is dead as blood clots. I gave her her flowers. I love her too much and she hurt my feelings. Tell them now that I am sorry.
>
> You can give them my voicemail. Let them listen to it. I am sorry about it, but people have to understand how deep people care for them. Don't disappoint them and that's what she did to me. Don't disappoint me. The only thing I could do she keep telling me about the police, police, police. I don't like and it hurt me.

7

Furthermore, she lying. I never threaten her, never with all that bullshit. She talking, I am sorry. Take care of yourself. Just get the baby for me. That is all I am worried about. I want Obama hear voice mail and let Obama know I want him to adopt the baby and grow her with his two daughters. I love her and will always love her. I would love if my family happy for her, give her my love. They won't see me again.

N.T. 10/25/2023, at 38-44.

Based on Mr. Gayle's identification of Appellant as the speaker in this voicemail, Detective Bartol submitted a search warrant for the phone records associated with a phone number that had been attributed to Appellant's cell phone, which had been registered under the same T-Mobile account as Ms. Roberts' cell phone. The phone records showed that no calls were made from this device on April 5, 2015, or April 6, 2015. *Id.* at 48-49, 71-73. Detective Bartol learned from Detectives Bamberski and Rossiter that the caller who left Mr. Gayle the voicemail instead used a number associated with the "Digicel" application. Detective Bartol explained that Digicel allowed users to make international calls from Jamaica to the United States and that the numbers generated by Digicel were identifiable by an 8-7-6 Jamaican area code. *Id.* at 44, 67-69.

Detective Bartol also testified that he and Detective Whalen interviewed Sheena Douglas on April 10, 2015, after she contacted homicide. Sheena Douglas testified that she had met and befriended Ms. Roberts at their home care job in 2010. Ms. Douglas testified that she and Ms. Roberts talked over the phone daily until Ms. Roberts' death in 2015 and specified that they only spoke directly over the phone and never texted each other. Ms. Douglas recalled that the last time she spoke with Ms. Roberts over the phone was a Thursday night in April 2015. Ms. Douglas stated that she called Ms. Roberts on Friday, April 3, 2015, but Ms. Roberts did not answer. *Id.* at 45; N.T. 10/24/2023, at 168-170.

Ms. Douglas did, however, receive text messages from Ms. Roberts' cell phone on that date. At 5:13 p.m. on April 3, 2015, Ms. Douglas received a text message from Ms. Roberts'

8

device which said, "Hi, Dear." At 5:44 p.m., Ms. Douglas received a message that said, "When we get back baby." At 5:45 p.m., Ms. Douglas received another message that said, "Andrea baby." Ms. Douglas characterized these messages as "strange," stating that Ms. Roberts never referred to her as "baby" and reiterating that she and Ms. Roberts never sent each other text messages. Ms. Douglas initially tried calling Ms. Roberts upon reading these "strange" messages, then sent a text message at 5:52 p.m. to Ms. Roberts' device which read, "Andrea where are you." Ms. Douglas subsequently learned that police had found Ms. Roberts' body on April 5, 2015. N.T. 10/24/2023, at 171-172.

On April 15, 2015, Detectives Bartol and Whalen interviewed Nicholas Tejada in a convenience store at 5400 Willows Avenue, which neighbored Ms. Roberts' home. Mr. Tejada testified that he worked at that convenience store from 2010 until 2018 and that he lived in a home built "[o]n top of the store." Mr. Tejada testified that he was familiar with Ms. Roberts, as she would "come into [his] store and shop," and identified Appellant by article of clothing. Mr. Tejada stated that Ms. Roberts and Appellant lived in the home neighboring his store with a baby and an elderly woman who needed help "walking and getting in and out." Mr. Tejada recalled that they moved into the neighboring home at some point in 2014, roughly a year before Ms. Roberts' death. *Id.* at 115-126; N.T. 10/25/2023, at 59-66.

Mr. Tejada testified that he heard an argument take place inside the home shared by Appellant and Ms. Roberts on Thursday, April 2, 2015. Mr. Tejada recalled hearing Ms. Roberts admonishing Appellant "for having lost money that she had saved up to buy a house." Mr. Tejada also recalled hearing Ms. Roberts' and Appellant's young daughter crying "way too much" late Thursday night and again the following morning. Additionally, Mr. Tejada noted that

9

he spotted Appellant briefly exit and reenter his residence the day after Mr. Tejada heard the excessive crying. N.T. 10/24/2023, at 119-120.

During the investigation, Detective Bartol discovered that several "domestic related" 9-1-1 calls were made from 5402 Willows Avenue. Philadelphia Police Detective Devin Chadderton testified that he responded to two (2) such calls on March 9, 2015. Detective Chadderton first responded at 9:01 a.m. to a domestic complaint reported by Ms. Roberts against Appellant. Detective Chadderton left the residence after approximately ten (10) or fifteen (15) minutes, found that Ms. Roberts was "[j]ust a little distraught," and documented this incident as a "verbal dispute only." At 11:46 a.m. that same day, Detective Chadderton received notification of another domestic incident occurring at 5402 Willows Avenue, reported, this time, by Appellant against Ms. Roberts. Once more, Detective Chadderton departed the residence after a few minutes, finding nothing that warranted an arrest, although he did note "visible injuries" to Appellant's body in the subsequent report. N.T. 10/25/2023, at 26-36, 47-48.

After learning that Appellant boarded a flight from Atlanta to Jamaica on April 5, 2015, Detective Bartol requested an arrest warrant for Appellant. The warrant was approved on April 17, 2015, and subsequently assigned to the fugitive squad. After a lengthy extradition period, Appellant was arrested for murder pursuant to the April 17th warrant and returned to the United States in October 2020. *Id.* at 50, 77-78.

The Commonwealth and Appellant's counsel stipulated that if Philadelphia Police Detective Reilly were to testify, she would testify that she recovered fingernail clippings from Ms. Roberts' left and right hands on March 20, 2018, and placed the samples on a property receipt, which were then taken to the chemistry lab within the Philadelphia Police Department. Counsel also stipulated that if Philadelphia Police Detective Blackwell were to testify, he would

testify that he took an oral swab from Appellant on October 20, 2020, and placed the swabs on a property receipt, which were then taken to the criminalistics lab within the Philadelphia Police Department. N.T. 10/24/2023, at 128.

Jean Hess, an expert in forensic DNA analysis, analyzed these samples and recorded her findings in a report issued on April 24, 2023. Hess found that the sample of Ms. Roberts right-hand fingernail clippings consisted of a mixture of DNA originating from Ms. Roberts and at least two additional individuals, at least one of whom was male. Using Appellant's DNA as a comparative sample, Hess found that the scenario that the mixture consisted of DNA from Ms. Roberts, Appellant, and one "random unrelated individual" was substantially more probable than any scenario where Appellant's DNA was not present in the mixture. *Id.* at 133-35.

Hess also found that the DNA mixture detected under Ms. Roberts' left-hand fingernail clippings consisted of DNA from a "major component" and a "partial minor component." Hess testified that Ms. Roberts was deemed the contributor for the major component of the mixture. Hess testified that although male DNA was found to be present in the partial minor component, there was insufficient data to include or exclude Appellant as a contributor. Hess also analyzed samples taken from vaginal and rectal swabs of Ms. Roberts and found that the DNA in each sample was consistent with originating from Ms. Roberts. Additionally, no male DNA was detected in either sample. *Id.* at 137-147.

Finally, the Commonwealth and Appellant's counsel stipulated that if Appellant's mother, Melva Rattary, were to testify, she would testify to Appellant's reputation in the community as a "law-abiding and non-violent person." N.T. 10/25/2023, at 127.

## Procedural History

11

On May 26, 2022, Appellant filed through counsel a petition for expert fees to retain an audibility expert and a Patois linguist as well as a petition for investigator fees. At a trial readiness conference held on June 8, 2022, this Court granted Appellant's petition for investigator fees and held Appellant's petition for expert fees under advisement. On August 22, 2022, Appellant renewed his petition for expert fees. On February 17, 2023, Appellant filed a motion to suppress his videotaped statement taken on October 9, 2020, on the basis that it was obtained in violation of his Fifth, Sixth, and Fourteenth Amendment rights under the U.S. Constitution. On the same date, the Commonwealth filed a motion *in limine* to admit other crimes evidence of prior assaults committed by Appellant against Andrea Roberts.

On February 21, 2023, Appellant withdrew his request for expert fees for an audibility expert based on his refusal to provide a voice sample to counsel. On September 14, 2023, Appellant filed a motion *in limine* to bar any references to any of Appellant's prior arrests or convictions and any restraining orders filed by Ms. Roberts against Appellant and to bar the introduction of any medical examiner photos, a Protection From Abuse ("PFA") order, any statements made by Ms. Roberts in her temporary PFA Order and two (2) Philadelphia Police Domestic Violence Reports regarding verbal disputes that took place on January 14, 2015, and March 9, 2015. On October 19, 2023, Appellant supplemented his motion in *limine* and requested that this Court bar testimony from Devon Gayle referencing any domestic violence-related threats and/or assaults between Appellant and Ms. Roberts.

This Court held a pretrial hearing on October 19, 2023, in which it first permitted Appellant to withdraw his motion to suppress his October 9, 2020 video statement. Furthermore, this Court granted Appellant's motion *in limine* in part and denied in part. This Court permitted the Commonwealth to include evidence of the two (2) verbal domestic disputes, but prohibited

12

the Commonwealth from introducing any testimony about any previous PFAs or Temporary PFAs between Appellant and Ms. Roberts or any testimony from either Devon Gayle or Sheena Douglas regarding any domestic violence-related threats and/or assaults between Appellant and Ms. Roberts. N.T. 10/19/2023, at 47-52.

Appellant's jury trial commenced before this Court on October 23, 2023. On October 26, 2023, after hearing all evidence, closing arguments from counsel, and jury instructions from this Court, a jury deliberated and found Appellant guilty of Murder of the First Degree and Endangering Welfare of Children ("EWOC"). Appellant's counsel waived having presentence investigation and mental health reports completed prior to sentencing. Subsequently, after hearing a victim impact statement from Jasmir Roberts, the adult daughter of Andrea Roberts, this Court sentenced Appellant to a mandatory term of life imprisonment without the possibility of parole for the murder conviction, and a concurrent term of one (1) to two (2) years of confinement for the EWOC conviction. N.T. 10/26/2023, at 10-13.

On October 27, 2023, Appellant filed timely post-sentence motions requesting a judgment of acquittal and challenging the sufficiency and weight of the evidence. This Court denied Appellant's post-sentence motions on October 31, 2023. On November 14, 2023, Appellant filed a timely notice of appeal from the judgment of sentence imposed on October 26, 2023. On November 16, 2023, this Court directed Appellant to file a 1925(b) Statement of Errors Complained of on Appeal, which Appellant subsequently filed on November 17, 2023. In his 1925(b) Statement of Errors, Appellant raises the following issues for review:

1. The verdict for each offense was not sufficient to establish Defendant's guilt beyond a reasonable doubt.

    a. As to the homicide charge, no testimonial, documentary, or digital evidence established Defendant's guilt beyond a reasonable doubt.

13

b. As to endangering the welfare of a child, no evidence established that the child ever experienced, or was at risk of, physical danger.

2. The verdict on both charges was against the weight of the evidence to establish that the Defendant killed the decedent and endangered a child.

3. The Court erred by admitting into evidence police testimony of two domestic violence reports, as no arrests were made, and both the decedent and Defendant were complainants.

Appellant's Pa.R.A.P. 1925(b) Statement of Matters (reordered).

## Discussion

**I. There was sufficient evidence for a jury to convict Appellant of Murder of the First Degree and Endangering Welfare of Children.**

Appellant claims that there was insufficient evidence to support the jury's verdict finding Appellant guilty of Murder of the First Degree and Endangering Welfare of Children ("EWOC"). Appellant argues that the Commonwealth did not introduce any testimonial, documentary, or digital evidence sufficient to find Appellant guilty of Murder beyond a reasonable doubt. As to his EWOC conviction, Appellant also argues that there was no evidence which established that the child D.L. ever experienced, or was at risk of, physical danger.

In reviewing a challenge to the sufficiency of the evidence, the standard of review is to "determine whether the evidence admitted at trial and all reasonable inferences therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt." *Commonwealth v. Palmer*, 192 A.3d 85, 89 (Pa. Super. 2018). This standard is equally applicable to cases where the evidence is circumstantial rather than direct "so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Walker*, 836 A.2d 999, 1000 n.3 (Pa. Super. 2003).

14

The Commonwealth may sustain its burden by means of wholly circumstantial evidence. *Commonwealth v. Montalvo*, 956 A.2d 926, 932 (Pa. 2008) (citing *Commonwealth v. Diggs*, 949 A.2d 873, 877 (Pa. 2008). Additionally, "[w]hen a person commits a crime, knows that he is wanted therefor, and flees or conceals himself, such conduct is evidence of consciousness of guilt, and may form the basis [of a conviction] in connection with other proof from which guilt may be inferred." *Commonwealth v. Clark*, 961 A.2d 80, 92 (Pa. 2008) (quoting *Commonwealth v. Rios*, 684 A.2d 1025, 1035 (Pa. 1996)).

As will be further explained below, this Court concludes that when viewing the evidence in the light most favorable to the Commonwealth as verdict winner, there was sufficient evidence for a jury to convict Appellant of Murder of the First Degree and EWOC. Appellant's challenge to the sufficiency of the evidence for his convictions is therefore without merit and, accordingly, no relief is due.

a. The Commonwealth presented ample forensic and testimonial evidence sufficient to establish that Appellant was guilty of Murder of the First Degree beyond a reasonable doubt.

Appellant first argues that there was no testimonial, documentary, or digital evidence which established that he was guilty of Murder of the First Degree beyond a reasonable doubt. A criminal homicide constitutes Murder of the First Degree "when it is committed by an intentional killing." 18 Pa.C.S.A. § 2502(a). An intentional killing is defined as a killing accomplished "by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S.A. § 2502(d). In effect, to convict a defendant of Murder of the First Degree, a jury must find that "(1) a human being was unlawfully killed; (2) the defendant is responsible for the killing; and (3) the defendant acted with a specific intent to kill." *Commonwealth v. Montalvo*, 956 A.2d 926, 932 (Pa. 2008).

15

"An intent to kill can be formed in a fraction of a second. All that is required is a conscious, fully formed intent to bring about the death of another." *Commonwealth v. Davis*, 479 A.2d 1077, 1080 (Pa. Super. 1984) (citing *Commonwealth v. O'Searo*, 352 A.2d 30, 37-38 (Pa. 1976)). Specific intent to kill "can be proven if the defendant knowingly applies deadly force to the person of another." *Commonwealth v. Simmons*, 662 A.2d 621, 629 (Pa. 1995). "The Supreme Court of Pennsylvania has held that "evidence of death by strangulation can be sufficient to establish the requisite intent" for Murder of the First Degree. *Commonwealth v. Pruitt*, 951 A.2d 307, 319 (Pa. 2008).

The Commonwealth presented ample evidence sufficient to convict Appellant of each element of Murder of the First Degree beyond a reasonable doubt. The record reflects that sufficient evidence was presented to show that Appellant unlawfully killed Andrea Roberts with the specific intent to bring about her death. The evidence first established that Ms. Roberts was unlawfully killed. Dr. Khalil Wardak testified that the cause of Ms. Roberts' death was strangulation and that the manner of her death was homicide. In support of his conclusions, Dr. Wardak identified several injuries to Ms. Roberts' neck area noted in her autopsy, including a fracture to her right hyoid bone, a bruise on her chin, hemorrhages in her neck and under the skin of her scalp, and ruptured blood vessels at the base of her neck. Dr. Wardak testified that these injuries were consistent with an individual applying twenty (20) pounds of pressure to Ms. Roberts' neck long enough to both initially cause loss of consciousness and fully accomplish asphyxiation by strangulation. The Commonwealth and Appellant's counsel also stipulated that the toxicology reports for Ms. Roberts were negative for all substances, further supporting the conclusion that Ms. Roberts was unlawfully strangled to death. N.T. 10/24/2023, at 76-82.

16

The record also reflects that sufficient evidence existed to implicate Appellant as the individual responsible for killing Ms. Roberts. Devon Gayle testified that on April 5, 2015, he received a voicemail from Appellant in which Appellant confessed to killing Ms. Roberts. Mr. Gayle explained that he was able to identify Appellant as the speaker on the voicemail because he had met him in person in 2014 and also spoken with him over the phone on several occasions. Mr. Gayle also stated that the two (2) spoke in Jamaican Patois during these conversations, which was also the language spoken in the voicemail. *Id.* at 11-12, 24-26.

Mr. Gayle testified that he later went to the police station to report the voicemail he had received from Appellant. Mr. Gayle provided an initial translation for the officers at the police station, stating that Appellant had declared in the voicemail that Ms. Roberts was "dead as blood cloth," that Appellant had killed her, and that Appellant had left Ms. Roberts' mother and daughter unharmed. Mr. Gayle also told police that Appellant admitted within the voicemail that he committed this killing because Ms. Roberts "disrespected him" by threatening to tell the police that Appellant had threatened her with violence. Finally, Mr. Gayle explained that Appellant stated in the voicemail that he had given Ms. Roberts flowers, that he wished for Mr. Gayle to report the message to the police, and that he wanted his daughter to be found and adopted by President Barack Obama. *Id.* at 16-23.

Philadelphia Police Detective John Bartol testified that a police officer familiar with Jamaican Patois later provided a written English translation of the voicemail. The Commonwealth and Appellant's counsel stipulated to the accuracy of this translation, which corroborated Mr. Gayle's initial account of the contents of the message. In relevant part, the translation read as follows:

> She put on a report about me saying I will shoot her in her head. Her mother and the baby, I didn't do anything to her mother and the baby, but I killed her. Make

17

sure you call the police and tell them she is dead as blood clots. I gave her her flowers. . . . The only thing I could do she keep telling me about the police, police, police. I don't like and it hurt me. Furthermore, she lying. I never threaten her . . . . Just get the baby for me. That is all I am worried about. I want Obama hear voice mail and let Obama know I want him to adopt the baby and grow her with his two daughters.

N.T. 10/25/2023, at 38-44.

Police subsequently responded to the home of Ms. Roberts and Appellant at 5402 Willows Avenue and found the scene in conditions identical to those Appellant had described in his voicemail. Philadelphia Police Officer Mark Brockington found both Nora Barrett, Ms. Robert's mother, and D.L., the one-year-old daughter of Appellant and Ms. Roberts, unharmed in the second-floor middle bedroom of the home. Officer Brockington then found Ms. Roberts' deceased body in the second-floor rear bedroom of the home. Officer Brockington observed that Ms. Roberts was covered in a blanket with flowers on and around her body, just as Appellant had described in the voicemail. Philadelphia Police Officer Robert Flade testified that one of the photographs taken by the Crime Scene Unit also showed that there were flowers around Ms. Roberts' body, confirming details that Appellant provided about the crime scene which demonstrated the veracity of his confession. *Id.* at 7-10, 102.

Testimony from Mr. Gayle, Sheena Douglas, Nicholas Tejada, and Dr. Wardak helped establish a clear timeline of events leading up to when Appellant killed Ms. Roberts. Mr. Gayle and Ms. Douglas both testified that they had known Ms. Roberts for several years and were regularly in contact with her over the phone. Ms. Douglas testified that she last spoke to Ms. Roberts on the phone on Thursday, April 2, 2015, while Mr. Gayle testified that he last spoke with her on the morning of Friday, April 3, 2015. Ms. Douglas also noted that she received "strange" text messages from Ms. Roberts' device on that date, which she found to be uncharacteristic of Ms. Roberts' ordinary behavior. 10/24/2023, at 9-13, 168-172.

18

Nicholas Tejada, who lived next to the home shared by Appellant and Ms. Roberts, recalled overhearing an argument take place between Appellant and Ms. Roberts on Thursday, April 2, 2015, the day before Ms. Douglas received the strange messages from Ms. Roberts' phone and Mr. Gayle's final phone conversation with Ms. Roberts. Mr. Tejada also testified that he heard Ms. Roberts' and Appellant's infant daughter crying "way too much" beginning the night of the argument and continuing into the next day. Mr. Tejada also spotted Appellant leave and reenter his residence on Friday, April 3, 2015. *Id.* at 117-120.

On April 6, 2015, Dr. Gulino performed an autopsy on Ms. Roberts' and recorded his findings in a report. Dr. Wardak, who reviewed everything documented by Dr. Gulino, testified that asphyxiation by strangulation was the cause of Ms. Roberts' death. Based on the condition of Ms. Roberts' body, Dr. Wardak testified that at the time the autopsy was conducted, Ms. Roberts had been decomposing for a minimum of one (1) day but more likely around three (3) to (5) days. N.T. 10/24/2023, at 70-76, 84.

Ms. Roberts was thus killed approximately sometime between April 1, 2015, and April 5, 2015. However, Ms. Roberts could not have died any earlier than the morning of Friday, April 3, 2015, when she spoke with Mr. Gayle over the phone. On the day prior, Mr. Tejada overheard the argument between Ms. Roberts and Appellant and also heard their baby crying excessively in their home. Accordingly, the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to conclude that Appellant carried out Ms. Roberts' murder sometime after Ms. Roberts' final conversation with Mr. Gayle on the morning of April 3, 2015, but before Ms. Douglas began receiving strange text messages from Ms. Roberts' device at 5:13 p.m. that afternoon. Two (2) days later, Appellant left the voicemail for Mr. Gayle in which he confessed that he had killed Ms. Roberts but left her mother and daughter in the home unharmed.

19

The Commonwealth also provided evidence which suggested Appellant's motive to kill Ms. Roberts. Philadelphia Police Detective Devin Chadderton testified about two (2) domestic verbal disputes between Appellant and Ms. Roberts that occurred on March 9, 2015. Detective Chadderton, who responded to both incidents, noted "visible injuries" to Appellant's body following the second incident, indicating that the domestic disputes between the two (2) had potentially escalated into physical acts of violence. N.T. 10/25/2023, at 26-36.

Furthermore, the Commonwealth offered evidence which indicated that Appellant and Ms. Roberts had made physical contact prior to her death. A DNA sample collected from Appellant was compared to a DNA sample retrieved from fingernail clippings recovered post-mortem from Ms. Roberts. N.T. 10/24/2023, at 128. After analyzing both samples, Jean Hess concluded to a significant statistical probability that Appellant's DNA was present under Ms. Roberts' right-hand fingernail clippings. *Id.* at 133-35.

Detective Bartol also learned that Appellant boarded a flight from Atlanta to Jamaica on April 5, 2015. This was consistent with Appellant's statement in his voicemail to Mr. Gayle that his family "won't see him again." In this voicemail, Appellant told Mr. Gayle that he had killed Ms. Roberts and that he wanted him to tell the police that she was dead and that he was sorry for what he did. Appellant used the "Digicel" application to place the call from Jamaica to Mr. Gayle in which he left the voicemail. Following a lengthy extradition period, Appellant was ultimately arrested and returned to the United States in October 2020. *Id.* at 38-44, 50, 77-78; N.T. 10/25/2023, at 67-69.

Viewed in the light most favorable to the Commonwealth as verdict winner, the foregoing evidence was thus sufficient to establish that Appellant had a motive to kill Ms. Roberts. The evidence also established that Appellant was present at the scene of the crime – the

20

home he shared with Ms. Roberts – on the approximate date and time in which Ms. Roberts was killed. Finally, the evidence showed that Appellant knew he had committed a crime that needed to be reported to the police but that he subsequently fled the area, thereby indicating a consciousness of guilt. Accordingly, the Commonwealth provided sufficient evidence to conclude that Appellant was responsible for killing Ms. Roberts.

Finally, the record reflects that sufficient evidence to establish Appellant's specific intent to kill Ms. Roberts. As previously stated, Dr. Wardak testified that Ms. Roberts' cause of death was asphyxiation by strangulation. Several injuries found on Ms. Roberts' body – the fracture to her right hyoid bone, a bruise on the left side of her chin, and hemorrhages and ruptured blood vessels along Ms. Roberts' neck and under her scalp – indicated that she had been strangled to death. Dr. Wardak explained what was necessary for death by strangulation to occur, testifying that an individual would need to first block the victim's throat by applying about twenty (20) pounds of pressure for approximately fifteen (15) seconds, which would cause the victim to lose consciousness. Dr. Wardak emphasized that the individual would then need to continue applying the pressure while the victim was still unconscious for more than a minute until the victim is unable to regain consciousness. N.T. 10/24/2023, at 76-81.

Accordingly, Appellant necessarily must have strangled Ms. Roberts for over a minute in order to kill her. Appellant could have stopped applying pressure after fifteen (15) seconds and allowed Ms. Roberts to regain consciousness but instead continued applying pressure. In fact, Appellant applied enough pressure to Ms. Roberts' airway over a sustained period of time such that he actively prevented her from regaining consciousness and ultimately killed her, causing the physical injuries found during Ms. Roberts' autopsy. This sustained period of using deadly force to strangle Ms. Roberts plainly evinced Appellant's conscious, fully formed, and specific

21

intent to bring about Ms. Roberts' death. Moreover, evidence of Ms. Roberts' death by manual strangulation was alone sufficient to establish Appellant's specific intent to kill.

Additional testimony further demonstrated that Appellant possessed the specific intent to kill Ms. Roberts. In the voicemail he left for Mr. Gayle, Appellant himself admitted to killing Ms. Roberts because she had disrespected and disappointed Appellant by threatening to tell the police that Appellant was going to shoot her. N.T. 10/24/2023, at 22-23; N.T. 10/25/2023, at 38-44. In his confession, Appellant thus both expressed his specific intent to kill Ms. Roberts and confirmed that he had already done so.

This Court thus concludes that the Commonwealth introduced sufficient evidence to support each element of Appellant's conviction for Murder of the First Degree. Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, Appellant was responsible for unlawfully killing Andrea Roberts and acted with specific intent to kill when he strangled her to death. Appellant's challenge to the sufficiency of the evidence regarding his Murder of the First Degree conviction is therefore without merit and no relief is due.

b. The Commonwealth presented ample testimony sufficient to establish that Appellant was guilty of Endangering Welfare of Children beyond a reasonable doubt.

Appellant next argues that there was insufficient evidence to convict him of Endangering Welfare of Children ("EWOC") beyond a reasonable doubt because there was no evidence which established that his daughter, D.L., ever experienced, or was at risk of, physical danger. The Crimes Code defines the offense of EWOC, in relevant part, as follows: "A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection, or support." 18 Pa.C.S.A. § 4304(a)(1).

22

To sustain a conviction for EWOC, the Commonwealth "must prove that a defendant knowingly violated a duty of care to the minor victim." *Commonwealth v. Keister*, 292 A.3d 1138, 1141 (Pa. Super. 2023). Pennsylvania courts have employed a three-pronged test to determine whether the evidence is sufficient to prove that a defendant knowingly violated a duty of care:

> (1) the accused is aware of his/her duty to protect the child; (2) the accused is aware that the child is in circumstances that threaten the child's physical or psychological welfare; and (3) the accused has either failed to act or has taken actions so lame or meager that such actions cannot reasonably be expected to be effective to protect the child's welfare."

*Commonwealth v. Lynn*, 114 A.3d 796, 819 (Pa. 2015). EWOC "is a specific intent offense which was enacted in broad terms to safeguard the welfare and security of children." *Commonwealth v. Vela-Garrett*, 251 A.3d 811, 815 (Pa. Super. 2021) (quoting *Commonwealth v. Fewell*, 654 A.2d 1109, 1117 (Pa. Super. 1995).

Numerous witnesses, including Philadelphia Police Sergeant Michael Davis, testified that D.L. was the one-year-old daughter of Appellant and Andrea Roberts. Nicholas Tejada testified that he lived next to the house where Appellant and Ms. Roberts lived along with D.L. and Ms. Roberts' mother. N.T. 10/24/2023, at 115-126, 156. Appellant was thus a parent as defined by 18 Pa.C.S.A. § 4304(a)(1) who was responsible for supervising the welfare of D.L., a child under eighteen (18) years of age. Accordingly, Appellant owed a duty of care to D.L.

The Commonwealth presented ample evidence that Appellant knowingly violated his duty of care to D.L. and was therefore guilty of EWOC beyond a reasonable doubt. Devon Gayle testified that he received a voicemail from Appellant on April 5, 2015, in which Appellant told him that he had killed Ms. Roberts but left her mother and daughter unharmed. An English translation of the voicemail, which was in Jamaican Patois, revealed that Appellant told Mr.

23

Gayle that his baby was "in the house" and that he wanted police to "get her for me tonight." Appellant also instructed Mr. Gayle to "get the baby for me" and have President Barack Obama listen to the voicemail and adopt the baby so she could grow up with his daughters. N.T. 10/24/2023, at 16-23; N.T. 10/25/2023, at 38-44. The contents of this voicemail were sufficient to demonstrate that Appellant, as D.L.'s parent, was aware of his duty to protect D.L.

Additionally, there was sufficient evidence to establish that Appellant placed D.L. in circumstances which threatened her physical or psychological welfare. Philadelphia Police Officer Mark Brockington testified that on the evening of April 5, 2015, he went to 5402 Willows Avenue in Philadelphia and, once he was able to enter into the locked home, found Nora Barrett, Ms. Roberts' mother, and D.L. together in the middle, upstairs bedroom of the home. At the time, Ms. Barrett was seventy-four (74) years old. Officer Brockington tried talking to talk to Ms. Barrett, asking her if she was okay and if she knew where Ms. Roberts was. Ms. Barrett "mumbled" in response and appeared to, as Officer Brockington stated, "have cognitive issues, maybe dementia." Officer Brockington subsequently found Ms. Roberts dead in the rear bedroom. N.T. 10/25/2023, at 6-12.

Detective Bartol testified that he later spoke with Ms. Barrett at the University of Pennsylvania Hospital but was unable to conduct a successful interview because Ms. Barrett was suffering from "advanced stages of Alzheimer's" and could not communicate verbally. D.L. was taken to the Department of Human Services. Nicholas Tejada confirmed that Ms. Barrett lived in the home next to his, with Appellant, Ms. Roberts, and D.L. Mr. Tejada testified that he had, at times, seen Ms. Barrett enter and exit the home. Mr. Tejada referred to Ms. Barrett as an "elderly lady" and noted that she "needed help walking and getting in and out." Moreover, Mr. Tejada testified that he heard D.L. crying excessively on April 2, 2015, after Appellant and Ms. Roberts

24

audibly argued about money, and that the crying continued into the next day. Mr. Tejada testified that he saw Appellant exit and reenter his home the day after the argument took place. *Id.* at 46, 120-121.

The testimony elicited by the Commonwealth thus established that Nora Barrett, Ms. Roberts' mother, was an elderly woman whose limited cognitive and physical capabilities demonstrated that she did not have the ability to care for an infant child. Appellant, who likely knew about Ms. Barrett's capabilities given that they were living together, nonetheless left his one-year-old daughter D.L. in the home with only Ms. Barrett present. As this Court previously discussed, Ms. Roberts was likely killed sometime on April 3, 2015. Appellant subsequently fled Philadelphia and boarded a flight from Atlanta to Jamaica two (2) days later. Once in Jamaica, Appellant called Mr. Gayle and left a voicemail in which he admitted that he had killed Ms. Roberts but left D.L. "in the house" unharmed with Ms. Barrett. Appellant requested that Mr. Gayle have police come and get D.L. *Id.* at 38-44, 50, 67-69, 77-78.

The evidence, viewed in the light most favorable to the Commonwealth as verdict winner, thus suggests that Appellant killed Ms. Roberts and abandoned his one-year-old daughter, D.L., to flee the country. Appellant left D.L. with Ms. Barrett, who was incapable of caring for an infant child. Additionally, Appellant left D.L. in a home where her own mother was on the floor deceased, having been strangled to death. D.L. and Ms. Barrett may have been inside the home for as many as two (2) days before they were discovered. Appellant left the place locked, which required police to forcibly enter before they were able to discover Ms. Barrett, D.L., and Ms. Roberts' body. Appellant clearly contemplated in his voicemail that D.L. would not be well-cared for because he insisted that Mr. Gayle have the police come and get her.

25

Accordingly, the evidence shows that D.L. was placed in circumstances that could have potentially threatened both her psychological and physical welfare.

Finally, the record reflects that Appellant did not take any actions that could have reasonably been expected to be effective to protect his daughter's psychological and physical welfare. In fact, the record reflects that Appellant himself created the circumstances that caused the dangerous condition. Appellant killed Ms. Roberts, fled the scene of the crime, and locked the home, thus denying D.L. access to the adequate supervision a one (1)-year-old infant child requires. Appellant waited days to contact Mr. Gayle and ask him to alert the police about the circumstances he placed his daughter in. Moreover, this Court does not find that Appellant's unrealistic request that D.L. be adopted and raised by President Obama constituted any reasonable effort to safeguard D.L.'s welfare. Accordingly, this Court finds that there was sufficient evidence to sustain Appellant's EWOC conviction. Appellant's challenge to the sufficiency of the evidence is therefore without merit and no relief is due.

## II. The verdict finding Appellant guilty of Murder of the First Degree and Endangering Welfare of Children was not against the weight of the evidence.

Appellant next claims that the verdict finding him guilty of Murder of the First Degree and Endangering Welfare of Children ("EWOC") was against the weight of the evidence. Appellant contends that the weight of the evidence did not establish that he killed Andrea Roberts and endangered his child, D.L. Appellant's challenge to the weight of the evidence is without merit and no relief is due.

Pennsylvania law regarding appellate review of weight of the evidence claims is well settled. A claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Widmer*, 744 A.2d 745, 751-752 (Pa. 2000). A true weight of the evidence challenge "concedes that sufficient evidence exists to sustain the

26

verdict but questions which evidence is to be believed." *Commonwealth v. Thompson*, 106 A.3d 742, 758 (Pa. Super. 2014). A new trial "should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Widmer*, 744 A.2d at 752. In determining if the verdict is against the weight of the evidence, the trial court does not "sit as the thirteenth juror" but instead must find that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (2013) (quoting *Widmer*, 744 A.2d at 752).

When seeking to determine the credibility of the witnesses, the finder of fact is "free to believe all, none, or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Clemens*, 242 A.3d 659, 667 (Pa. Super. 2020). Reversal of a trial court verdict should therefore only be granted where the evidence is so "tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Akhmedov*, 216 A.3d 307, 326 (Pa. Super. 2019). A jury's verdict "shocks the judicial conscience" when it "causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench." *Id.* (quoting *Commonwealth v. Davidson*, 860 A.2d 575, 581 (Pa. Super. 2004)).

As the finder of fact in Appellant's case, it was the function of the jury to evaluate the evidence and determine the weight it should be given. The jury weighed the testimony and evidence presented by the Commonwealth's ten (10) witnesses in such a manner as to find Appellant guilty of one (1) count of Murder in the First Degree and one (1) count of EWOC. Appellant subsequently filed post-sentence motions in which he argued that the jury's verdict was against the weight of the evidence. After a review of the testimony and evidence presented at trial, this Court denied Appellant's post-sentence motions without a hearing. In denying

27

Appellant's post-sentence motions, this Court properly concluded that the jury's verdict did not shock the judicial conscience and was adequately supported by the weight of the evidence.

As this Court previously explained, and as Appellant now effectively concedes in challenging the weight of the evidence, there was sufficient evidence for the jury to convict Appellant of Murder of the First Degree and EWOC. The evidence presented by the ten (10) witnesses at Appellant's trial led the jury to reasonably infer that Appellant strangled Ms. Roberts to death with the specific intent to kill to kill her and knowingly violated his duty of care to D.L. by placing her in circumstances that threatened her psychological and physical welfare and failing to take reasonable steps to mitigate any potential harm to her.

Dr. Khalil Wardak testified that Ms. Roberts died from asphyxia by strangulation and that the manner of her death was homicide. N.T. 10/24/2023, at 70-81. Philadelphia Police Officer Mark Brockington and Philadelphia Police Sergeant Michael Davis provided testimony corroborating Dr. Wardak's conclusion that Ms. Roberts died due to homicidal strangulation. Officer Brockington testified that he found Ms. Roberts' body in the second-floor rear bedroom of her home at 5402 Willows Avenue in Philadelphia and stated that there was "trauma to [her] head and face" and that "it looked like [her] face and head had been beaten." N.T. 10/25/2023, at 10-11. Sergeant Davis testified that Ms. Roberts' face was "swollen" and that there was blood on her body as well. N.T. 10/24/2023, at 158.

On the evening of April 5, 2015, Appellant called Devon Gayle and left a voicemail in which he confessed to killing Ms. Roberts. Mr. Gayle testified that he went to the police upon hearing Appellant's voicemail, which contained specific details. The Commonwealth supported Mr. Gayle's testimony regarding the details of Appellant's voicemail with corroborating accounts from other witnesses. Mr. Gayle testified that Appellant stated in the voicemail that he

had left flowers around Ms. Roberts' body after killing her. *Id.* at 23. Philadelphia Police Detective John Bartol read into the record a translation of Appellant's voicemail, which Appellant's counsel stipulated was accurate, in which Appellant stated that he "gave [Ms. Roberts] her flowers." N.T. 10/25/2023, at 43. Both Officer Brockington and Philadelphia Police Officer Robert Flade, who responded to the scene of the crime where Ms. Roberts was found deceased, specifically recalled that they saw flowers around Ms. Roberts' body. *Id.* at 10; N.T. 10/24/2023, at 102.

Mr. Gayle identified Appellant as the speaker who left the voicemail based on his familiarity with Appellant's voice from previous phone conversations and at least one (1) in-person encounter. N.T. 10/24/2023, at 11-12. Detective Bartol offered additional testimony confirming that Appellant was the individual who left Mr. Gayle the incriminating message. Detective Bartol investigated the phone number which left Mr. Gayle the voicemail and found it consistent with a number using the "Digicel" application, which allows Jamaican callers to make international phone calls identifiable by an 8-7-6 Jamaican area code. N.T. 10/25/2023, at 67-69. Furthermore, Detective Bartol testified that he learning during the investigation into MS. Roberts' murder that Appellant had boarded a flight from the United States to Jamaica on April 5, 2015, the day Mr. Gayle received the voicemail that Appellant left which ultimately led police to Ms. Roberts' body. *Id.* at 77-78.

The Commonwealth also offered corroborating witness accounts which established that Appellant violated his duty of care to his one-year-old daughter, D.L. Mr. Gayle testified that Nora Barrett, Ms. Roberts' mother, was not "collected in the head" and that he believed she had some sort of "sickness" based on her inability to consciously hold a conversation. N.T. 10/24/2023, at 16-17. Sergeant Davis testified that he attempted to speak with Ms. Barrett, who

29

was found in the bedroom next to the room where Ms. Roberts was found dead. Sergeant Davis stated that Ms. Barrett was ultimately taken to the hospital as she was "not comprehending everything going on around her." *Id.* at 157-58. Nicholas Tejada, who lived next to the home shared by Appellant, Ms. Roberts, Ms. Barrett, and D.L., stated that each time he saw Ms. Barrett, she needed help walking and getting in and out of the home. *Id.* at 123. Officer Brockington and Sergeant Davis both gave testimony which showed that D.L. had been left with only Ms. Barrett until they were discovered by police alongside Ms. Roberts' dead body. N.T. 10/25/2023, at 10.

The Commonwealth thus presented compelling testimony and evidence supporting the jury's verdict finding Appellant guilty of Murder of the First Degree and EWOC. The Commonwealth presented evidence which, when weighed together, showed that Ms. Roberts was unlawfully killed, that Appellant was responsible for this killing, and that Appellant specifically intended to kill her. The evidence also showed that Appellant placed his one-year-old daughter D.L. in potentially dangerous circumstances by leaving her without adequate supervision for an extended period of time. The testimony and evidence presented at Appellant's trial was thus not so "tenuous, vague and uncertain" such that the jury's verdict shocked the conscience of this Court. Accordingly, this Court properly exercised its discretion in denying Appellant's post-sentence motions. Appellant's challenge to the weight of the evidence is therefore without merit and no relief is due.

III. **This Court properly exercised its discretion in admitting into evidence police testimony regarding two domestic violence reports involving Appellant and the decedent, Andrea Roberts.**

Finally, Appellant claims that this Court erred by admitting into evidence police testimony about two (2) domestic violence reports from January 14, 2015, and March 9, 2015. Appellant contends that no arrests were made as a result of either of these domestic violence

30

reports and that both the decedent, Andrea Roberts, and Appellant were complainants. Appellant's final claim is without merit and no relief is due.

The "admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion." *Commonwealth v. Reid*, 99 A.3d 470, 493 (Pa. 2014). An abuse of discretion "is not merely an error of judgement," but occurs when "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record." *Commonwealth v. Jackson*, 283 A.3d 814, 817 (Pa. Super. 2022) (quoting *Commonwealth v. Talley*, 236 A.3d 42, 55 (Pa. Super. 2020)).

To be admissible at trial, evidence must be relevant. Pa.R.E. 402. Evidence is relevant when it "has the tendency to make a fact more or less probable than it would be without the evidence," and said fact "is of consequence in determining the action." *Jackson*, 283 A.3d at 817 (citing Pa.R.E. 401(a)-(b)). Evidence is also relevant "if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding a material fact." *Id.* at 817-818 (quoting *Commonwealth v. Drumheller*, 808 A.2d 893, 904 (Pa. Super. 2002)). A court may exclude relevant evidence if its probative value is outweighed by a danger of unfair prejudice. Pa.R.E. 403.

Evidence of "any other crime, wrong, or act is not admissible to prove a person's character" to show that the person acted in conformity with those other acts on a particular occasion or to show the person's propensity to commit crimes. Pa.R.E. 404(b)(1); see also *Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278, 1283 (Pa. Super. 2004). This type of evidence may, however, "be admissible for another purpose, such as proving motive,

31

opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2).

Other acts evidence offered for a permissible purpose is admissible "only if the probative value of the evidence outweighs its potential for unfair prejudice." *Commonwealth v. Lark*, 543 A.2d 491, 497 (Pa. 1988). The Supreme Court of Pennsylvania has explained that such evidence must "have some relevance to the case" and not be "offered solely to inflame the jury or arouse prejudice against the defendant." *Id.* at 501. In domestic violence cases, evidence of prior abuse may be admissible to establish motive, intent, malice, or ill-will. *See Commonwealth v. Ivy*, 146 A.3d 241, 251-252 (Pa. Super. 2016). A trial court is "not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." *Commonwealth v. Hairston*, 84 A.3d 657, 666 (Pa. 2014).

On February 17, 2023, the Commonwealth filed a motion *in limine* to admit other crimes evidence of prior assaults committed by Appellant against Andrea Roberts. On September 14, 2023, and October 19, 2023, Appellant filed motions *in limine* in which he sought to bar the introduction of two (2) Philadelphia Police Domestic Violence Reports regarding verbal disputes involving Appellant and Ms. Roberts which took place on January 14, 2015, and March 9, 2015. This Court held a motion hearing on October 19, 2023, in which it addressed these motions.

The Commonwealth explained that police responded to a complaint from Ms. Roberts on January 14, 2015, regarding a verbal dispute she had with Appellant regarding their living arrangements. Police also responded on March 9, 2015, for another dispute that Ms. Roberts called in regarding a dispute she had with Appellant over money. On the same date, police again responded to the residence after Appellant complained about another dispute. Both incidents

were characterized as verbal disputes without any threats of violence and no arrests were made on either date. N.T. 10/19/2023, at 37-39.

Appellant's counsel argued that there was no way to tell "what direction these incidents" were going given that both Appellant and Ms. Roberts called police. Appellant's counsel also emphasized that the incidents were documented as verbal disputes only and that there was "nothing in the record" to suggest that these disputes "would lead to violence." The Commonwealth argued that the domestic violence reports had probative value based on its theory that they were relevant to why Appellant killed Ms. Roberts. The Commonwealth explained to this Court that it intended to introduce testimony at Appellant's trial that would establish that Devon Gayle received a voicemail in which Appellant declared that he killed Ms. Roberts because she "put a report out against me saying I will shoot her in the head" and because "[s]he keeps calling the police on me, telling me about the police, police, police, and I said I do not like it and it hurt me." Appellant argued that these statements would only be probative if the Commonwealth could provide evidence that it was indeed Appellant who left Mr. Gayle this voicemail and if the contents of the message were accurate. *Id.* at 39-44.

This Court held that the domestic violence reports would be relevant to the jury's determination of Devon Gayle's credibility and the credibility of the contents of the voicemail that Appellant left for Mr. Gayle. This Court found the reports probative of what Appellant may have said in the voicemail – that he was upset about Ms. Roberts calling the police. This Court noted that the reports were only to be used in conjunction with Mr. Gayle's testimony regarding the substance of the voicemail he received. This Court also stated its intention to appropriately instruct the jury so that it would not consider this evidence improperly. *Id.* at 45-46.

33

Upon further review of the record, this Court concludes that the other acts evidence of the two (2) domestic violence reports was relevant, that its probative value was not outweighed by a danger of unfair prejudice, and that it was offered not as propensity evidence but to show Appellant's motive to kill Ms. Roberts. The other acts evidence was relevant to corroborating the testimony of Devon Gayle, who ultimately testified at Appellant's trial that he received a voicemail from Appellant. Mr. Gayle explained how he was able to identify Appellant's voice. In this voicemail, Appellant told Mr. Gayle he killed Ms. Roberts because she had "disrespected" him and threatened to tell the police that Appellant was going to shoot her. N.T. 10/24/2023, at 6-23. Police later translated this voicemail, which was in Jamaican Patois, and found that Appellant stated that Ms. Roberts "put on a report about me saying I will shoot her in her head" and that he was disappointed and hurt because she kept "telling me about the police, police, police." N.T. 10/25/2023, at 38-44.

The domestic violence reports were thus probative of whether Mr. Gayle was accurate about the contents of the voicemail he received from Appellant. Additionally, they were probative to whether Appellant was being truthful about why he killed Ms. Roberts. Appellant plainly stated his motive for killing Ms. Roberts within this voicemail. Accordingly, the reports, while constituting other acts evidence, were being offered for an admissible purpose. These reports were indicative of domestic violence between Appellant and Ms. Roberts which escalated from verbal disputes to Appellant's violent retaliation in strangling Ms. Roberts to death.

This Court properly instructed the jury on how to analyze the credibility of Appellant's voicemail and testimony that was given regarding the statements made by Appellant within that voicemail:

You heard . . . testimony regarding the defendant's statements and voice mail that was left. You may not consider the statement as evidence against the defendant unless you find that the defendant, in fact, made the statement.

Obviously, words actually written or spoken by a defendant should not be used against him or her unless he or she actually uttered those words. Only so much of a statement as was actually made by a defendant may be considered as evidence against him or her.

If you find the defendant made the statement, then you may weigh it along with other evidence in the case in determining whether he has been proven guilty beyond a reasonable doubt.

N.T. 10/25/2023, at 203-204.

Furthermore, this Court directed the Commonwealth at the motion to hearing to clearly specify that the two (2) domestic violence reports from January 14, 2015, and March 9, 2015, were verbal and not violent in nature N.T. 10/19/2023, at 45-46. At Appellant's trial, the Commonwealth complied with this direction. Philadelphia Police Detective Devin Chadderton testified that both incidents were "verbal disputes only" that did not result in any arrests. N.T. 10/25/2023, at 30-34. Accordingly, this Court properly exercised its discretion in admitting into evidence police testimony regarding two domestic violence reports involving Appellant and Ms. Roberts. Appellant's final claim is therefore without merit and no relief is due.

## Conclusion

In summary, this Court has carefully reviewed the entire record and finds no harmful, prejudicial, or reversible error and nothing to justify the granting of Appellant's request for relief. For the reasons set forth above, the judgment of the trial court should be affirmed.

By the Court:

_____
HONORABLE CHARLES A. EHRLICH

_____
Date

35